**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Robert E. Blackburn**

Civil Case No.  03-cv-02504-REB-CBS

PETER HORNICK, an individual,

     Plaintiff,

v.

GARY BOYCE, and
JOANNE BOYCE, individuals,

     Defendants.

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS

---

**Blackburn, J.**

     This matter came before me for nonjury trial on August 7 through 8, 2006.

     Having judicially noticed all relevant adjudicative facts in the file and record of

this case *pro tanto*; having considered and accepted the stipulations of the parties;

having considered the evidence educed in its various forms; having determined the

credibility of the witnesses; having weighed the evidence; having considered the

reasons stated, arguments advanced, and the authorities cited by the parties in written

and oral form; and being otherwise sufficiently advised, I enter the following findings of

fact established by a preponderance of the evidence, conclusions of law, and orders.[1]

### FINDINGS OF FACT

     1. The plaintiff, Peter Hornick, is and was at the time of the commencement of

---

[1] Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more properly deemed a finding of fact, shall be as more properly characterized.

this action a resident of the state of New York. The defendants, Gary Boyce and Joanne Boyce, are and were at the time of the commencement of this action residents of the state of Colorado, and are husband and wife.[2]

2.   The amount in controversy exceeds $75,000, exclusive of interest and costs.

3.   In the summer of 1994, Hornick and Boyce were introduced to each other by mutual acquaintances. They discussed the possibility of jointly pursuing the acquisition and development of certain water rights in Colorado's San Luis Valley.

4.   The water rights that the parties sought to acquire and develop were those associated with the Luis Maria Baca Grant No. 4 Ranch (Baca Ranch) and the neighboring Villa Grove Ranch. Both ranches and their concomitant water rights were owned by American Water Development, Inc. (AWDI).

5.   AWDI had been unsuccessful legally in its efforts to develop these water rights. However, Boyce had a plan designed to eschew and surmount the problems that spoiled AWDI's efforts.

6.   On December 23, 1994, the parties contracted with AWDI to purchase the Villa Grove Ranch for $750,000. The ranch consists of three separate ranches, the Nye, the Barsch-Miller, and the Round Hill, which include approximately 5,000 deeded acres in northern Saguache County, Colorado, and approximately 12,000 acres of Bureau of Land Management grazing allotment. The ranch is described in Exhibit A to Exhibit 57A.

7.   By correspondence dated January 25, 1995, from Hornick to Boyce, the

---

[2] For convenience I refer to the parties as follows: Peter Hornick as plaintiff or Hornick; Gary Boyce and Joanne Boyce as defendants or Boyces; and Gary Boyce, individually, as Boyce.

parties memorialized their basic agreement about development of their water project in the San Luis Valley. (Exhibit 2). To facilitate their project, two Colorado limited liability companies had been formed: the Villa Grove Ranch Co.,LLC. (Villa Grove), and the Cabeza de Vaca Land & Cattle Co., LLC. (Cabeza).

8.   The parties each held a fifty percent membership ownership interest in the Villa Grove Ranch Co.,LLC., based on each party's capital contribution of $375,000 (for a total of $750,000, the sum necessary to fund Villa Grove's purchase from AWDI).

9.   Villa Grove was formed to serve as a holding company for the property rights acquired from AWDI.  Effective December 23, 1994, the parties entered into an Operating Agreement of Villa Grove Ranch Co., LLC. (operating agreement). (Exhibit 1). Under the operating agreement Boyce was appointed Manager, a position he still holds (or held until he conveyed the assets of Villa Grove to himself and his wife purportedly pursuant to the buy-sell provision under the operating agreement). As Manager, Boyce had plenary – and in many situations exclusive – authority over management of the LLC, its assets, and its day to day operations. As a result, Hornick has had virtually no involvement in the management and operation of Villa Grove.

10.   In addition to their interest in Villa Grove Ranch Co., LLC., Hornick, Stockman's Water Company (Stockman's), which was owned by the Boyces, and a venture capital company, Vaca Partners, LP. (Vaca), were members in Cabeza.  In 1995, Cabeza purchased the 100,000 acre Baca Ranch in the San Luis Valley to implement and facilitate their overall water project.

11.   As Manager of Villa Grove, Boyce had conveyed the water rights owned by

3

Villa Grove to Cabeza. This transfer of water rights has been the subject of ongoing personal and professional strife between Hornick and Boyce and has been the subject of several lawsuits between them both in federal and state court.

12. In 1999, Vaca, which controlled Cabeza, and, thus, the overall water project, decided to abandon the project. Hornick and Stockman's (Boyces) disagreed with Vaca's decision, which disagreement eventually precipitated litigation among the members of Cabeza.

13.  In 2000, Boyce tried to purchase Vaca's interest in Cabeza in an effort to revive and continue development of the overall water project. Boyce wanted to bring in a new investor to replace Ferallon, the original investor, which had lost its appetite for the deal. Boyce wanted his stepson, Kevin Brandt, to make those arrangements. Boyce approached Hornick to solicit his cooperation in implementing Boyce's new strategy, which *per force* required Hornick's cooperation.  Hornick agreed to cooperate in exchange for an option to purchase Boyce's membership interest in Villa Grove.

14.  The parties negotiated an option price of $500,000. Hornick initially offered $375,000, which was the amount of Boyce's original capital contribution, reasoning that this was fair compensation since Boyce had the exclusive benefit of Villa Grove's net income for the first three years and one-half of the net income thereafter. However, Boyce told Hornick that ". . .  he needed to make a margin above that [Boyce's initial capital contribution of $375,000] and we settled on a price of $500,000."

15.  Hornick cogently and reasonably valued Villa Grove at approximately $4,000,000. Hornick consulted two local real estate brokers in the valley and checked

values in ranch magazines.  After calling around to get a sense of what property values were, he valued Villa Grove's three ranches as follow: the Round Hill ranch at approximately $1,000 per acre; the Nye ranch at approximately $1,200 per acre; and the Barsch-Miller ranch at approximately $500-600 per acre, for an average of approximately $800 per acre. Hornick's valuation was corroborated by his discussions some years later with Boyce, who attempted to persuade Hornick to accept a proposal that would net the parties more than four million for the Villa Grove ranches.

16.  On October 12, 2000, the parties executed an Option Agreement. (Exhibit 5).  In this short, two and one-half page document, the parties stated succinctly their few and straightforward terms to accomplish Hornick's purchase of Boyce's fifty percent membership interest in Villa Grove. Basically, Hornick was granted an exclusive, one-year option to purchase Boyce's membership for $500,000.

Under the rubric of "Recitals," the "Interest" to be purchased by Hornick was defined as follows:

> B. Hornick has requested, and Boyce has agreed to grant to Hornick, an option to purchase all of Boyce's right, title and interest in the Company, including, without limitation, Boyce's fifty (50%) percent membership interest therein, all rights to distributions on account thereof and all rights Boyce may have as the "Manager" of the Company (collectively, the "Interest").

Also under the rubric of "Recitals," the consideration for the agreement was recited as follows:

> NOW, THEREFORE, for and in consideration of the sum of One Hundred and 00/100 ($100.00) Dollars paid by Hornick to Boyce (the "Option Payment"), which sum shall be non-refundable, and for good and valuable consideration, the amount, receipt, and sufficiency of which are hereby

acknowledged , Boyce and Hornick covenant as follows:[3]

The Option Agreement required Hornick to exercise his option to purchase by no later than 11:59 p.m. (EST), on October 12, 2001, failing which the option expired. The Option Agreement provided in relevant part as follows:

> 2. Boyce hereby grants to Hornick on the terms and conditions set forth below, an irrevocable and exclusive option (the "Option") to purchase the Interest during the period commencing on the date hereof [October 12, 2000] and expiring on October 12, 2001 (the "Option Expiration Date").

> 5. Hornick's rights under this Option must be exercised by Hornick on or before 11:59 P.M., Eastern Time, on the Option Expiration Date. If Hornick does not exercise his rights under this Option on or before that date and time, (a) this Option shall automatically cease and terminate at 11:59 P.M. Eastern Time on the Option Expiration Date; (b) the Option granted pursuant to this Agreement shall be null and void; and (c) the Option Payment [$100] shall be retained by Boyce in consideration of the grant of this Option.

Clearly, the parties intended and required that time was of the essence in exercising the option.

The Option Agreement provided a closing date and specified the few matters to be accomplished in the event the option was timely exercised.

> 4. In the event Hornick shall exercise his right to purchase the Interest, then at the "Closing" (which shall be the first business day after th 60th calendar day following the date of the notice of Option exercise) (a) Boyce shall execute and deliver (I) an assignment of the Interest, (ii) Boyce's resignation as Manager, and (iii) such other instruments as Hornick or his attorney may reasonably require to transfer the Interest to Hornick, free and clear of all liens and adverse interests and/or to effectuate the purposes of this Agree-

---

[3] Although Boyce was expecting Hornick's eventual cooperation in Boyce's efforts to refinance the water deal, the terms and scope of Hornick's cooperation were never the subject of a specific, enforceable oral or written agreement between the parties; this is, *a fortiori*, since Boyce failed in his efforts to refinance. Tellingly, the Option Agreement does not recite or include Hornick's cooperation as consideration. Instead, consideration for the Hornick-Boyce option was stated expressly as $500,000, without anything else from Hornick. Thus, the parties' Option Agreement is a complete agreement, per se.

ment and (b) Hornick shall pay the balance of the Purchase Price in immed-
iately available funds.

Unlike the timing of the exercise of the option, the parties did not intend and
require that time was of the essence in closing the transaction.

17. Effective October 10, 2001, Hornick exercised his rights under the option in
the time and manner required by the Option Agreement. (Exhibit 9).

18. In the October 10, 2001, letter in which Hornick exercised the option, he
stated, "The closing shall occur on or about Monday, December 11, 2001 or such other
date as may be mutually agreed upon." (Exhibit 9).  Monday was December 10, 2001,
which should have been the closing date as calculated under the Option Agreement.
However, at all times the parties reasonably treated, accepted, and used Tuesday, Dec.
11, 2001, as the closing date.

19. Contemporaneous with, but before, the closing scheduled and planned for
Tuesday, December 11, 2001, Hornick assigned his interest in the Hornick-Boyce
Option Agreement (Exhibit 5) to Ross Brupbacher (Brupbacher). The Hornick to
Brupbacher assignment was memorialized and reflected in five primary documents: 1)
an Agreement To Assign Option To Purchase Membership Interest (Exhibit 11); 2) an
Assignment of Option (Exhibit 47 at 47-1); 3) an Agreement To Loan Funds (Exhibit 47
at 47-3); 4) an Amended and Restated Operating Agreement (Exhibit 48); and 5) a
Colorado Promissory Note (Exhibit 47 at 47-2).[4] Brupbacher "executed" his "option" with
Hornick well before the deadline of December 11, 2001, imposed in the Hornick-

---

[4] The parties do not dispute the validity, propriety, or legality of this assignment or any of the
related documents.

7

Brupbacher Agreement To Assign Option To Purchase Membership Interest (Exhibit 11 at 11-1, ¶ 2) and the their Agreement To Loan Funds (Exhibit 47 at 47-3, ¶ 2.a)).

The assignment was precipitated by Brupbacher's interest in acquiring the Round Hill property and by Hornick's interest in fashioning a tax saving transaction. Brupbacher owned property nearby. Hornick wanted to eschew an immediate taxable transaction and instead, wanted to defer any taxable gain realized via the subsequent sale or disposition of the Villa Grove assets.  Their transaction was structured accordingly.

20. The Hornick to Brupbacher assignment of the Hornick-Boyce option was communicated to Boyces on or about Friday, December 7, 2001, prior to the closing scheduled for December 11, 2001. (Exhibit 7).

21. At all times relevant to the Hornick-Boyce option and the Hornick to Brupbacher assignment, Robert Bruce, Esq. (Bruce), represented Hornick as his attorney-at-law. However, for purposes of closing the Hornick-Boyce Option Agreement, Bruce acted as escrow and closing agent for both Hornick and Brupbacher, and Bruce was treated and used as such by Hornick, Brupbacher, and Boyce. Bruce well understood the transaction between Hornick and Brupbacher and the transaction between Brupbacher (and Hornick) and the Boyces.  Bruce well understood also the closing requirements of both Hornick and Brupbacher.  At all times Bruce acted within the scope of the express or implied authority given him by Hornick and Brupbacher. Virtually all of the essential communications among Hornick, Brupbacher, and Boyces involved Bruce. It is pellucid that Boyces regarded and used Bruce as their official

8

liaison to Hornick and Brupbacher.

22.   At all times relevant to the closing of the Hornick-Boyce Option Agreement, Hornick was an integral and indispensable party, whose participation was necessary from both Brupbacher's and Boyce's perspectives.  Brupbacher had his closing requirements, none of which was inconsistent with the Hornick-Boyce Option Agreement or the Hornick to Brupbacher assignment. Additionally, Brupbacher was aware of and sensitive to Hornick's closing requirements, which Brupbacher intended to support and preserve. Brupbacher would not and did not knowingly accept and approve closing documents to which Hornick objected.

23.   On December 11, 2001, and for a reasonable time thereafter to include through December 31, 2001, Brupbacher (and Hornick) were ready, willing, and able to close the Hornick-Boyce Option Agreement. On December 11, 2001, and for a reasonable time thereafter, Brupbacher had immediately available funds to pay Boyces the balance of the option "Purchase Price." (Exhibit 13).

24.   Neither on or before December 11, 2001, nor within a reasonable time thereafter to include through December 31, 2001, were Boyces ready or willing to close under the terms of the Option Agreement.  Neither on or before December 11, 2001, nor within a reasonable time thereafter to include through December 31, 2001, did Boyces 1) tender a commercially reasonable and acceptable form of assignment of the "Interest" (as defined by the Option Agreement [Exhibit 5 at 1, ¶ B]); or 2) tender Gary Boyce's resignation as "Manager" of Villa Grove Ranch Co., LLC., all as required by the Option Agreement (Exhibit 5 at 2, ¶ 4).

25.  On and before December 11, 2001, and for a reasonable time thereafter to include through December 31, 2001, Boyces failed and refused without justification to tender a form of assignment that was reasonably acceptable under the terms of the Hornick-Boyce Option Agreement or to Brupbacher and Hornick. On or before December 11, 2001, and for a reasonable time thereafter to include through December 31, 2001, Boyces tendered proposed forms of assignment that were nonconforming under the terms of the Hornick-Boyce Option Agreement and that were justifiably unacceptable to Brupbacher and/or Hornick.

For example, on December 10, 2001, in anticipation of the closing on December 11, 2001, Boyces, through their attorney, transmitted to Brupbacher and Hornick, through their joint escrow and closing agent, Bruce, a Bill of Sale, Assignment And Assumption Agreement. (Exhibit 44). This integrated, unitary document consisting of nine pages contained many unreasonable and onerous terms and provisions that were not required or permitted by the Hornick-Boyce Option Agreement and that were reasonably objectionable to Brupbacher and Hornick. Illustrative of such impermissible and objectionable terms were the "as is, where is" clause, (Exhibit 44 at 44-3, ¶ 3.(b)), the "assignee indemnification" clause, (Exhibit 44 at 44-4,  ¶ 5), and the "Acknowledgment And Consent" form requiring Hornick's signature, (Exhibit 44 at 44-10). Justifiably, Brupbacher objected to inclusion of the "assignee indemnification" clause, and Hornick objected to inclusion of the "Acknowledgment And Consent" form. Neither was required by the Hornick-Boyce Option Agreement. (Exhibit 5). Bruce was authorized expressly or implicitly by Hornick and Brupbacher to reject any form of

10

assignment requiring either.

Concerning the "Acknowledgment And Consent" form requiring Hornick's signature, (Exhibit 44 at 44-10), Boyce inexorably would not proceed to closing without such a form signed by Hornick.  However, such a form was not required by the Option Agreement, and the form contained terms that were unreasonably onerous to Hornick. Boyce's inexorable insistence on such a form as a condition precedent to closing was *per se* a breach of the Option Agreement.[5]

26.   Although various versions and drafts of proposed assignments and closing documents were exchanged and discussed by the parties on December 11, 2001, and for a reasonable time thereafter to include through December 31, 2001, none was mutually acceptable, because all such documents contained one or more provisions that were not required under the Hornick-Boyce Option Agreement and that were justifiably unacceptable to Brupbacher and/or Hornick. (*See, e.g.*, Exhibits 17, 14, 15, and 18).[6]

27.   Gary Boyce's true reason for refusing to close on December 11, 2001, and for a reasonable time thereafter to include through December 31, 2001, was unrelated to the form and substance of the various documents exchanged among the principals. Instead, Bruce testified credibly and cogently, that on December 11, 2001, contemporaneous with the scheduled closing, Gary Boyce admitted candidly to his

---

[5] Nothing in the Option Agreement requires or anticipates approval by signature or otherwise by Hornick or his assignee of the assignment required by the Option Agreement.

[6] Additionally, Hornick exerted his best efforts personally to revive and resurrect the Hornick-Boyce Option Agreement, which was sabotaged by Boyce. Hornick's personal efforts are memorialized in his correspondence to Boyce. *See* Exhibits 20, 21, and 25. However, these behind the scene good faith efforts were ultimately unsuccessful.

counsel that he, Boyce, refused to close because his enemy, Hornick, would be profiting from the Villa Grove project while he – Gary Boyce – would not. Gary Boyce's enmity, envy, and greed scuttled the closing, not nonperformance by Brupbacher or Hornick. Thereafter, all else advanced by Boyce was an ad hoc pretext designed and intended to mask or excuse his deliberate nonperformance in breach of the Hornick-Boyce Option Agreement.

28. By correspondence dated December 12, 2001, from John G. Lubitz, the attorney for the Boyces, to Robert J. Bruce, Esq., Lubitz incorrectly, as a matter of fact and law, wrongly accused Brupbacher and Hornick of failing to close in breach of the Hornick-Boyce Option Agreement and declared their rights terminated under the Option Agreement. (Exhibit 22).[7]

29. Brupbacher was not interested in pursuing the Hornick-Boyce transaction if it did not close by year-end 2001. (Exhibits 26 and 29). Boyces unreasonably failed and refused to close under the Option Agreement even by this extremely liberal and unilaterally extended year-end deadline.

30. At some time subsequent to Boyces' breach of the Hornick-Boyce Option Agreement, Brupbacher assigned his interest in that Option Agreement back to Hornick.

31. In January, 2005, Boyce exercised his ostensible buy-sell rights under the parties' operating agreement (Exhibit 1 at 1-34, ¶ 16.3). In the Offer Notice required by the operating agreement, Boyce proposed a sale price of $2,250,000. In his Reply Notice, Hornich, as the Notified Member, agreed to the proposed sale price.

---

[7] This letter constitutes further evidence that the defendants acknowledged, treated, and used Tuesday, December 11, 2001, without objection or reservation as the parties' closing date.

Accordingly, a closing was set, but the transaction never closed – a circumstance for which each party blamed the other.  Boyces waited three weeks after the agreed closing date and then unilaterally closed the transaction by conveying the Villa Grove Ranch property to themselves and tendering payment in the amount of $1,125,000 to Hornick through a title company.  Hornick refused tender of the payment and returned the check to the title company. These payment funds are held now in case number 05 CV 53 pending in the District Court of Saguache County, Colorado, in which Hornick and Boyces are opposing parties.

32.   Presently, the quondam real property of Villa Grove Ranch Co., LLC., is encumbered by the lien of a deed of trust granted by the Boyces to the Public Trustee of Saguache County, Colorado, for the benefit of First Southwest Bank of Center, Colorado, to secure payment of a promissory note dated August 2, 2005, in the original principal amount of $1,141,785.50, from Boyces to First Southwest Bank. (Exhibit 57A).

33.   Hornick invested in the Villa Grove project primarily for financial, not personal reasons. Any personal interest he may have had at one time in building a home on the Round Hill ranch property evanesced when he entered into the Hornick to Brupbacher assignment, which had the sale of the Round Hill property to Brupbacher as its principal goal .

34.   As a proximate result of Boyce's unexcused breach of the Hornick-Boyce Option Agreement, Hornick has suffered damages in an amount equal to the loss of the benefit of his bargain vis-à-vis Villa Grove.  Hornick's loss of the benefit of his bargain is the $4,000,000 that Villa Grove was worth on or about December 11, 2001 – the

closing date used and ratified by the parties –  less the $500,000 Hornick agreed to pay under the Hornick-Boyce Option Agreement. Thus, Hornick's damages are $3,500,000.[8]

35. In assessing the credibility of the four witnesses who testified at trial, I find as follows. On issues of fact in dispute, Hornick and Bruce were comparatively more credible than Boyce. Bruce and Brubacher were credible generally, but Bruce was comparatively more credible than Brupbacher on the issues of the discussions among the principal parties and the documents exchanged, reviewed, executed, and discussed among the principal parties before, on, and after December 11, 2001.[9]

## CONCLUSIONS OF LAW

1.  I have jurisdiction over the parties to this action. I have subject matter jurisdiction under 28 U.S.C. § 1332 (diversity of citizenship).

2.  Venue is proper in the United States District Court for the District of Colorado under 28 U.S.C. § 1391(a)(2).

3. A federal court exercising diversity jurisdiction must apply the choice of law provisions of the forum state in which it is sitting. *Shearson Lehman Brother's, Inc. v. M & M L Invs.*, 10 F.3d 1510, 1514 (10th Cir. 1993). Under Colorado's choice of law

---

[8] Ordinarily, Hornick's damages should be reduced by $2,000,000, which would represent the fifty percent ownership interest with which he started (one may not recover that portion, which one already has); however, his interest has been "purchased" by Boyces via the parties' buy-sell provisions of their operating agreement. Thus, no reduction is warranted or proper, because Hornick no longer has his original one-half ownership interest.

[9] For example, Brupbacher had no present recollection of seeing or reviewing the **Bill of Sale, Assignment and Assumption Agreement** (Exhibit 44 ) and could not find a copy in his file that he maintained for this transaction and which he believed to be complete. Thus, Brupbacher assumed he had not seen the proposed form of assignment. Contrastingly, Bruce testified convincingly that Brubacher was privy to Exhibit 44 contemporaneously with its receipt via fax on December 10. 2001. After seeing and listening to both testify, I found Bruce's memory to be better than that of Brupbacher about who did what to whom when, where, and how.

14

rules, the law of the state with the most significant relationship to the claims will be used. ***Elliot v. Turner Constr. Co.***, 381 F.3d 995, 1001 (10th Cir. 2004). Thus, I apply Colorado law.

4. In assessing the credibility of each witness who testified at trial, I have considered all facts and circumstances shown by the evidence that affect the credibility of each witness, including the following factors: each witness' means of knowledge, his ability to observe, and his strength of memory; the manner in which each witness might be affected by the outcome of the litigation; the relationship each witness has to either side in the case; and the extent to which each witness is either supported or contradicted by other witnesses or evidence presented at trial. It is based on these considerations that I entered findings of fact about the relative credibility of the four witnesses who testified at trial.

5. The plaintiff's claim and the defendants' defenses and counterclaim are presented and preserved in the Amended Final Pretrial Order [#80] entered September 23, 2005. Hornick claims that Boyce's breached the parties' Option Agreement (Exhibit 5). Hornick seeks specific performance or damages, interest, and costs. Boyces deny that they breached the Option Agreement, contending instead, that Hornick breached the Option Agreement.  Boyces assert also the following affirmative defenses: I) plaintiff's claim is barred by his prior breach of contract; ii) plaintiff's claim is barred by his failure to acknowledge the authority of Gary Boyce to convey certain company assets; iii) plaintiff's claim is barred by the doctrine of unclean hands; iv) plaintiff's claim is barred by estoppel; v) plaintiff has not suffered damages caused by defendants; vi)

plaintiff has failed to mitigate damages, if any; and vii) plaintiff abandoned the contract before attempting to perform.[10]   The Boyce's counterclaim that they are entitled to recision of the Option Agreement.

6.   A plaintiff asserting a claim for breach of contract under Colorado law must prove by a preponderance of the evidence: a) the existence of a lawful agreement between the parties; b) performance of that agreement by the plaintiff or justification for nonperformance; and c) a failure to perform the contract by the defendants. **CJI-Civ. 4**[th] 30:1; ***Western Distrib. Co. v. Diodosio***, 841 P.2d 1053, 1058 (Colo. 1992).  Hornick has proved each of the required essential elements by a preponderance of the evidence.[11]

7.   The defendants have failed to sustain their burden of proof by a preponderance of the evidence as to each of their affirmative defenses and their counterclaim.

8.   The Option Agreement (Exhibit 5) did not contain a "time is of the essence clause," generally, and it did not impose such a requirement vis-à-vis the closing date, specifically.  In fact, the language communicating the temporal formula for calculating the closing date was parenthetical – a grammatical cue as to the relative importance,

---

[10] Although not entirely clear, the defendants appear to defend in part by contending that Hornick's execution of the Acknowledgment And Consent form, which was included in virtually every form of assignment tendered by them, was an integral part of the consideration underpinning the Hornick-Boyce Option Agreement. However, I have not considered failure of consideration because it is an affirmative defense that defendants have not pled as required by Fed. R. Civ. P. 8(c) and have not preserved in the Amended Final Pretrial Order. In any event Boyce's acquisition of a substitute investor was an unsatisfied condition precedent to Hornick's cooperation by release, subordination, or otherwise.

[11] Preponderance of the evidence is the relevant degree of proof under Colorado law. *See* §13-25-127(1), C.R.S.

*vel non*, the parties placed on the issue of an immutable closing date. Thus, Hornick and the Boyces did not provide expressly or implicitly that time was of the essence vis-à-vis the closing date under their Option Agreement. Although time was of the essence as to the timing of the exercise of the option, it was not as to the closing of the transaction once the option had been exercised in the time prescribed in the parties' Option Agreement.  *See **Commonwealth Petroleum Co., Inc. v. Billingd***, 759 P.2d 736, 738 (Colo. App. 1987).

Defendants raised the issue of failure to close on December 10, 2001, as provided by the Option Agreement for the first time on July 31, 2006 – one week before trial –  in their Defendants'/Counterclaimants' Proposed Findings of Fact, Conclusions of Law and Order [#97]. Before then, commencing with their answer to the complaint and ending with their representations in the Amended Final Pretrial Order, the defendants had consistently acknowledged, accepted, and treated December 11, 2001, as the agreed closing date under the Option Agreement. Tellingly, as late as the entry of the Amended Final Pretrial Order [#80], the defendants represented expressly that December 11, 2001, was the closing date. *See* Amended Pretrial Order, Exhibit A (which is Defendants, Gary and Joanne Boyce's Statement of Claims and Defenses). Defendants are bound by their multiple, irrevocable judicial admissions that December 11, 2001, was the closing date accepted and used by the parties. *See* Fed. R. Civ. P. 8(d); and ***Hicks v. United States***, 486 F.2d 325, 328 n. 3 (10th Cir. 1973).

Defendants had issues about closing, but not about the closing date of December 11, 2001.  Although mistaken in their mutual understanding that December

11, 2001, was the first business day following 60 days after the date of the Option

Agreement, the parties effectively and intentionally used December 11, 2001, as their

closing date.  At all times the parties reasonably treated, accepted, and used Tuesday,

December 11, 2001, as the closing date. In summary, the closing date of December 11,

2001, instead of December. 10, 2001, was not an issue between the parties in the

context of consummating their Option Agreement. The closing date issue is an *ad hoc*

cavil introduced at the eleventh hour by defendants. It is, charitably, a logical and legal

red herring.[12]

        9.  I have found already as a matter of fact and now conclude as a matter of law

that the Bill of Sale, Assignment And Assumption Agreement (Exhibit 44) tendered

initially by Boyces was an integrated, unitary document consisting of nine pages, the

last of which was the Acknowledgment And Consent form.  Stated differently, the

Acknowledgment And Consent form on page nine was never intended to be a stand

alone document independent of the first eight pages of the Bill of Sale, Assignment And

Assumption Agreement. Two features of the Acknowledgment And Consent form belie

its status as an independent document: 1) the fact that the form is paginated

specifically as page nine suggests that it is inextricably related to and integrated with

the preceding eight consecutively numbered pages; and 2) the form at "(a)" refers to

"this Agreement," which can only be a reference to the Bill of Sale, Assignment And

Assumption Agreement, implying clearly that the Acknowledgment And Consent form is

---

        [12] In further support of my conclusion, I approve, adopt, and incorporate the reasons stated, arguments advanced, and authorities cited by plaintiff in Plaintiff Hornick's Trial Brief at 2-3, ¶ 2, and at 6-7, ¶ 4 [#99] filed August 3, 2006.

a part of the overall Bill of Sale, Assignment And Assumption Agreement.  Thus, the Acknowledgment and Consent, which is page 9 of the nine-page Bill of Sale, Assignment And Assumption Agreement is not an independent, stand-alone document, but instead, is an integral part of the Bill of Sale, Assignment And Assumption Agreement. The assignment and the acknowledgment are inexorably tethered and concatenated.[13]

However, any argument to the contrary is mooted by Boyce's testimony to the effect that he considered it to be absolutely essential[14] to secure Hornick's signature on some iteration of Boyce's form of Acknowledgment And Consent.  Boyce was not about to close without Hornick's signature on Boyce's form of Acknowledgment And Consent, whether the form was an independent document or an integral part of the Bill of Sale, Assignment And Assumption Agreement.

10.  I construe the language in the Agreement To Assign Option To Purchase Membership Interest 1, ¶ 2 (Exhibit 11 at 1, ¶ 2) and in the Agreement To Loan Funds at 1, ¶ 2.a) (Exhibit 47 at 47-3, ¶ 2.a)) to require Brupbacher to exercise his option with Hornick by December 10 or 11, 2001, as opposed to require Brupbacher to close with the Boyces by December 10, 2001. My exegetical construction of this requirement in both documents is supported by Brupbacher's uncontroverted testimony to that effect. It is uncontroverted further that Brupbacher had performed these requirements vis-à-vis

---

[13] The Bill of Sale, Assignment and Assumption Agreement at 6, ¶ (f) (Exhibit 44 at 44-7, ¶ d), entitled "Entire Agreement," contains a boilerplate merger provision, which refers to an agreement, which I construe to refer to the Bill of Sale, Assignment and Assumption Agreement consisting of nine pages, the ninth page of which is entitled "Acknowledgment And Consent."

[14] "Paramount" was the word Boyce used during his testimony.

Hornick well before December 10, 2001. Nothwithstanding defendants' preoccupation, this matter is a non-issue.

11.   At all relevant times Bruce acted as an escrow and closing agent within the purview of the express or implied authority given him by Hornick and Brupbacher vis-à-vis the Hornick-Boyce Option Agreement and the Hornick to Brupbacher option and assignment.

12.   Boyces unjustified and unexcused breach of the Hornick-Boyce Option Agreement has caused Hornick to suffer and sustain pecuniary damages.

13.   Hornick's participation in the Villa Grove project was intended and designed by him to produce a profit, not to acquire property for his personal use or enjoyment. Thus, because Hornick's interest in the Villa Grove properties was primarily financial and not personal, and because the Hornick-Boyce Option Agreement focused on Boyce's membership interest in Villa Grove as opposed to an interest in specific, unique real property, and because Hornick attempted to sell the Round Hill property to Brubacher, and because the quondam real property owned by Villa Grove has been conveyed to Boyces and is the subject of a lien in favor of a non-party to this lawsuit and is the subject of litigation between Hornick and Boyces pending in state court, relief in the form of specific performance is impracticable, if warranted at all.  Thus, Hornick is entitled to money damages, not specific performance.

14.   Hornick is entitled to the benefit of his bargain vis-à-vis the Hornick-Boyce Option Agreement. (Exhibit 5). *See **Smith v. Hoyer***, 697 P.2d 761, 765 (Colo.App. 1984) ("The general measure of damages for breach of contract cases is that sum that

places the non-defaulting party in the position the party would have enjoyed had the breach not occurred.") On that basis, I have calculated Hornick's general or actual damages as a matter of fact to be $3,500,000. Therefore, as the proximate result of Boyce's unjustifiable breach of the Option Agreement, Hornick's total damages are $3,500,000. The calculation of Hornick's damages is unaffected by Boyce's post-breach exercise of their ostensible rights under the parties' operating agreement, and Hornick is not bound by Boyce's valuation of Hornick's membership interest for those purposes.

15.  In diversity cases prejudgment interest is determined by state law. ***Castro v. Arkansas-Louisiana Gas Co.***, 562 F.2d 622, 625 (10th Cit. 1977). Pursuant to §5-12-102(1)(a) and (b), C.R.S., Hornick is entitled to prejudgment interest in the amount of eight percent per annum compounded annually on his damages of $3,500,000 from the date of Boyce's breach of contract on December 11, 2001, to the date of the entry of judgment. *See* ***Bowen v. Farmers Ins. Exchange***, 929 P.2d 14, 16 (Colo. App. 1996); ***Logixx Automation, Inc. v. Lawrence Michels Family Trust***, 56 P.3d 1224 (Colo.App. 2002) (interest calculation begins at time breach of contract occurs).

16.  Hornick is entitled to post-judgment interest as provided under 28 U.S.C. § 1961.

17.  Under 28 U.S.C. § 1920, Hornick is entitled to his costs, which should be presented and taxed under FED. R. CIV. P. 54(d)(1) and  D.C.COLO.LCivR 54.1.

18.  To the extent that any claim, counterclaim, affirmative defense, or argument is not specifically addressed in this opinion, I have considered, but rejected all such matters.

19.  Although there are pages of findings of fact and conclusions of law, this case is no more complicated than one man refusing to honor his agreement with another man because of enmity and envy.

**THEREFORE, IT IS ORDERED** as follows:

1. That on the plaintiff's claim for breach of contract, judgment shall enter under FED. R. CIV. P. 58 for general damages in the amount of $3,500,000 in favor of the plaintiff, Peter Hornick, and against the defendants, Gary Boyce and Joanne Boyce, jointly and severally;

2. That on the defendants' counterclaim for recision, judgment shall enter under FED. R. CIV. P. 58 in favor of the plaintiff, Peter Hornick, and against the defendants, Gary Boyce and Joanne Boyce, jointly and severally;

3. That the plaintiff is awarded prejudgment interest in the amount of eight percent per annum compounded annually on his damages of $3,500,000 from the date of the breach of contract on December 11, 2001, until the date of judgment;

4. That the plaintiff is awarded post-judgment interest under 28 U.S.C. § 1961 from the date of the entry of judgment until it is satisfied; and

5. That the plaintiff is awarded his costs to be requested and taxed pursuant to FED. R. CIV. P. 54(d)(1) and  D.C.COLO.LCivR 54.1.

Dated August 30, 2006, at Denver, Colorado.

**BY THE COURT**

**s/ Robert E. Blackburn**
**Robert E. Blackburn**
**United States District Judge**